TARA K. MCGRATH
United States Attorney
P. KEVIN MOKHTARI
Assistant U.S. Attorney
California Bar No. 253283
ALLISON B. MURRAY
Special Assistant U.S. Attorney
California Bar No. 328814
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-8402
Email:  Kevin.Mokhtari@usdoj.gov

Attorneys for the Plaintiff
UNITED STATES OF AMERICA

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>JOSUE ADAN LEMUS-LARA,<br>  aka "Fenix,"<br><br>    Defendant. | Case No.: 18-CR-0390-DMS-2<br><br>**UNITED STATES' TRIAL MEMORANDUM**<br><br>Trial Date: October 30, 2023<br>Time:   9:00 a.m. |

The UNITED STATES OF AMERICA, by and through its counsel, Tara K. McGrath, United States Attorney, and P. Kevin Mokhtari, Assistant U.S. Attorney, and Allison B. Murray, Special Assistant U.S. Attorney, hereby files its Trial Memorandum in the above-captioned case.

# I.     STATEMENT OF THE CASE

## A.     The Charges

Defendant Josue Lemus-Lara is charged via indictment with one count of conspiracy to possess with intent to distribute cocaine on board a vessel, in violation of 46 U.S.C. §§ 70503, 70506(b), and one count of conspiracy to distribute cocaine intended for unlawful importation, in violation of 21 U.S.C. §§ 959, 960, 963.

The conspiracies in both counts are alleged to have occurred between a date unknown and up to and including January 2018. In both counts, the indictment charges that the offenses involved 5 kilograms and more of cocaine.

## B.     Trial Status

A jury trial is scheduled for Monday, October 30, 2023 at 9:00 a.m. The United States expects its case-in-chief to last approximately four days.

## C.     Status of Counsel

Josue Lemus-Lara is represented by appointed counsel Brian Funk.

## D.     Custody Status

Defendant is in custody. In addition, three of the government's potential witnesses are in custody.

## E.     Interpreter

The United States will require the assistance of Spanish language interpreters for the testimony of three of its witnesses. Defendant is a native Spanish speaker and requires the assistance of an interpreter.

## F.     Jury Waiver

Defendant has not filed a jury waiver.

## G.     Pre-Trial Motions

### 1.     Discovery Motions

During the pendency of the case, a discovery motion was filed by the defendant. There have been no significant discovery disputes and the government will continue to meet its discovery obligations.

**H.    Motions *in Limine***

**1.    Defendants' Motions**

Defendant filed motions to (1) dismiss for improper extradition and double jeopardy; (2) suppress wiretap evidence; (3) prohibit profile/organization and value evidence; and (4) exclude/prohibit display of drugs in the courtroom.  On October 20, 2023, the Court denied each of those motions.

**2.    The United States' Motions**

The United States filed motions *in limine* to (1) admit wiretap transcripts; (2) admit co-conspirator statements; (3) admit expert testimony on (i) the amount and type of drugs seized, (ii) drug value, cocaine branding and manufacturing, (iii) clandestine laboratories and cocaine production, (iv) Spanish language interpretation, and (v) maritime cocaine smuggling; (4) admit evidence of an intercepted cocaine brand that contains a swastika; (5) admit charts and summaries; (6) allow drugs in the courtroom; (7) admit U.S.-Ecuador forms exchange documents; (8) admit certified flight records; (9) admit foreign public records; (10) preclude evidence and argument of duress/necessity; (11) admit certified conviction records of Myve Lorena Orellana-Morales for a limited purpose; (12) preclude evidence not previously produced and experts not noticed; (13) allow attorney-conducted *voir dire*; (14) exclude witnesses except the case agent; and (15) compel reciprocal discovery.

On October 20, 2023, the Court ruled as follows:  (1) the wiretap transcripts are admissible upon foundation being laid for those intercepts; (2) the co-conspirator statements are admissible; (3) each of the categories of expert testimony are admissible and that the Court has conducted its gatekeeping inquiry as to the admissibility of those experts under Rule 702; (4) the government may introduce evidence of the cocaine brands referenced in its motion; (5) charts and summaries may be admitted; (6) drugs may be allowed in the courtroom; (7) the forms-exchange documents may be admitted; (8) certified flight records may be admitted; (9) foreign public records may be admitted; (10) evidence of duress/necessity are excluded; (11) subject to a limiting instruction, and based on the

government's explanation as to the relevance of the evidence, evidence of Myve Lorena Orellana-Morales's prior conviction for cocaine trafficking may be admitted; (12) evidence not produced or experts not noticed would be precluded; (13) both parties will receive 15 minutes of attorney voir dire; (14) witnesses except the case agent / defense investigator will be excluded, except that that expert witnesses may be present in court to watch the testimony of the dueling expert; and (15) the defendant is ordered to produce any reciprocal discovery.

## I.    Stipulations

The parties have agreed upon translations of Spanish language documents, including the wiretap intercepts, Guatemalan public records, and other documents. A stipulation will be provided to the Court. To date, the government does not anticipate any other stipulations.

## J.    Discovery

The United States has complied and will continue to comply with its discovery obligations.

## II.    STATEMENT OF FACTS

## A.    The Case

On January 18, 2018, defendant Josue Adan Lemus-Lara, aka "Fenix" ("Lemus-Lara") was indicted and charged in Count 1 with conspiracy to possess with intent to distribute cocaine on board a vessel, in violation of 46 U.S.C. §§ 70503, 70506(b) and in Count 2 with conspiracy to distribute cocaine intended for unlawful importation, in violation of 21 U.S.C. §§ 959, 960, 963. Lemus-Lara's co-defendant and older brother, Willian Lemus-Lara, aka "Humilde," ("Willian")[1] was extradited from Guatemala, pled guilty and was sentenced by this Court earlier this year. Defendant Josue Lemus-Lara, aka "Fenix," was extradited from Colombia in December 2020 and persists to trial.

---

[1] First names are used to avoid confusion since the brothers share the same last name.

4

## B. The Investigation

During a multi-year wiretap investigation led by Homeland Security Investigations ("HSI") and Drug Enforcement Administration ("DEA"), Willian and Josue Lemus-Lara were identified as leaders of a transnational criminal organization that moved ton quantities of cocaine from the littorals of South America via maritime smuggling routes to Guatemala and ultimately to conspirators in northwest Guatemala and Mexico, who in turn trafficked that cocaine to the United States.

Willian was the head of the organization and worked with two lieutenants to handle the logistics of maritime smuggling ventures, Luis Carlos Melgar-Morales, aka "Aquaman," and Rafael Orlando Ramirez-Barillas, aka "Thor." Willian was a prolific cocaine trafficker. His younger brother, Josue, was also a trafficker. In early 2017, Josue was in financial distress after several of his smuggling ventures had been foiled. To help his brother, the older Willian agreed to partner up with the younger Josue. Willian had planned to travel to Colombia to solidify his South American cocaine supply lines, but in May 2017, those plans changed. As Willian told both his lieutenant Melgar and his Mexico-based co-conspirator and cocaine trafficker, El Wero, Willian instead would be dispatching his brother, Josue, to Colombia to oversee the supply "line" of cocaine to Willian's drug trafficking organization.

In early May 2017, Willian arranged for Melgar to provide approximately $10,000 USD to Josue. Josue then traveled to San Salvador, El Salvador and flew to Medellin, Colombia along with his girlfriend and convicted cocaine trafficker, Myve Lorena Orellana-Morales, and his girlfriend's mother. Josue arrived in Medellin on May 8, 2017.

On May 8, 2017, Josue reported to Willian about events that occurred the night before at the airport, including that the "narcs" and come down on the "lady." Willian advised Josue that he should travel separately.

Within days of arriving in Colombia, Josue began reporting his conversations and meetings with Colombian counterparts to Willian. During intercepted communications, Willian and Josue discussed everything from the procurement of cocaine, the

5

manufacturing of specific brands of cocaine, the movement of millions of dollars of money to pay for cocaine loads, and maritime logistics.

Between May 19 and May 23, 2017, Willian coordinated and oversaw a smuggling venture culminating in cocaine shipments using four boats destined for Guatemala. The first boat containing 810 kilograms of cocaine was interdicted by the Guatemalan FEN (their Naval Special Forces). The United States Coast Guard interdicted two other boats in international waters and seized 781 kilograms from one boat on May 23, 2017, while the second boat jettisoned the cocaine prior to the interdiction. The fourth boat made it through and successfully delivered approximately 814 kilograms of cocaine to the conspirators.

On May 19, 2017, Willian reported to Josue, "Look we lost one today. 38 steps away. From taking… Getting to land." Josue responded, "Damn." Willian further told Josue that the boat crew had arrived at 11 in the morning. Willian urged his brother, Josue, who was his representative in Colombia, to be clear with their South American counterparts that they needed to enter from 7 onwards in the night. Josue responded to Willian by explaining that this was well "settled" and "before he left he emphasized all that." Evidence from the wiretap predating the May 23, 2017 seizure also connected the Coast Guard seizure to the conspiracy.

Between June 2017 and January 2018, Josue continued to coordinate the procurement of cocaine for the conspiracy and to act as Willian's representative in Colombia. Throughout this time, the conspirators were working on multiple maritime smuggling ventures.

For example, in June 2017, Josue orchestrated a maritime smuggling event involving the brand of cocaine ordered by Willian. Because of issues during the smuggling venture, the boat crew had jettisoned the cocaine load. Josue and other co-conspirators combed news outlets for news of a drug seizure. As Josue's co-conspirators discussed various news articles of recent maritime cocaine seizures, Josue told his co-conspirators that those were not theirs, because the quantity of cocaine and the brands did not match. During the same smuggling venture, Willian and Josue discussed coordinates where the at-sea transfer of

6

cocaine would take place. In response, Willian sent Josue screenshots of a BBM conversation between Melgar (Aquaman) and Ramirez-Barillas (Thor) discussing the coordinates of the at-sea transfers.

In late June 2017, agents intercepted a series of messages between Josue and a co-conspirator, FNU LNU, aka "Pastor Dios Es Grande." During the conversation, Josue told Pastor Dios Es Grande that he had lost six loads so he had partnered up with his relative (Willian Lemus-Lara). Josue further told Pastor Dios Es Grande that "We either make money. Or they'll put us in jail. Or they will have us killed. But we're no [homosexual slur]." He then copied his conversation and sent it to his girlfriend with whom he had traveled to Colombia.

In early July 2017, Josue took a flight from Medellin to Pasto, Colombia. From there, he crossed into Ecuador and traveled to a clandestine cocaine manufacturing laboratory. He sent over a dozen photos of the laboratory to Willian, and the two discussed the capabilities of the laboratory.

From the time he traveled to Colombia through January 2018—the end of the charged conspiracy period—Josue and Willian were in regular communication about several cocaine smuggling ventures. Throughout that time, Josue kept Willian abreast of the developments in South America.

In January 2018, Melgar traveled to the United States. At the end of his trip, Melgar was arrested at Los Angeles International Airport just before he was to board a return flight to Guatemala. During the arrest, agents discovered that Melgar was tracking an ongoing maritime smuggling venture on his cellphone. Contemporaneous intercepts also showed that Willian and Ramirez-Barillas were discussing an ongoing smuggling venture. On January 27, 2018, the U.S. Coast Guard interdicted a cocaine laden vessel in international waters. Naturally, the cocaine belonged to the conspiracy as intercepted communications showed Willian and Ramirez-Barillas discussing the venture as it was traveling through the ocean. After the conspirators learned of Melgar's arrest, agents intercepted communications revealing that Willian and Ramirez-Barillas had found out Melgar had

7

been arrested and that he was charged with "trafficking."  The conspirators who had been in communication with Melgar deleted him from Blackberry Messenger and within days ceased use of their respective devices.  The conspiracy alleged in the indictment began on a date unknown and is alleged to have continued up to and including January 2018.

In addition to extensive wiretap intercepts, evidence of the conspiracy is demonstrated by two U.S. Coast Guard seizures.  The first was on May 23, 2017 approximately 125 NM south of Guatemala. The second seizure was on January 27, 2018 approximately 265 NM southwest of Panama and 375 NM northwest of Ecuador.  Both seizures involved interdictions of stateless vessels in international waters.  In both instances, the captains of the interdicted vessels made oral claims for their vessels of Ecuadorian nationality.  In both instances, following a forms exchange between the U.S. and Ecuador, Ecuador responded that it could neither confirm nor deny the nationality/registry of the vessels, thereby rendering the vessel stateless and subject to the jurisdiction of the United States.




## III.   PERTINENT LAW

## A.   Count 1 – Conspiracy to Possess with Intent to Distribute Cocaine on Board a Vessel - 46 U.S.C. §§ 70503 and 70503(b)

### 1.   Essential Elements

The United States must prove beyond a reasonable doubt the following elements:

1. Beginning on or about a date unknown and ending on or about January 2018, there was an agreement between two or more persons to possess with intent

to distribute cocaine or some other federally controlled substance onboard a vessel subject to the jurisdiction of the United States;

2. Defendant joined in the agreement knowing of its purpose and intending to help accomplish that purpose.

In addition, the United States must prove beyond a reasonable doubt that the offense involved at least 5 kilograms of cocaine.

It does not matter whether the defendant knew that the substance was cocaine. It is sufficient that the defendant knew that it was some kind of a federally controlled substance.

To "possess with intent to distribute" means to possess with intent to deliver or transfer possession of cocaine to another person, with or without any financial interest in the transaction.

A conspiracy is a kind of criminal partnership—an agreement of two or more persons to commit one or more crimes. The crime of conspiracy is the agreement to do something unlawful; it does not matter whether the crime agreed upon was committed.

For a conspiracy to have existed, it is not necessary that the conspirator made a formal agreement or that he agreed on every detail of the conspiracy. It is not enough, however, that he simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another. You must find that there was a plan to commit the crime alleged in the indictment as an object of the conspiracy with all of you agreeing as to the particular crime which the conspirators agreed to commit.

One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though the person does not have full knowledge of all the details of the conspiracy. Furthermore, one who willfully joins an existing conspiracy is as responsible for it as the originators. On the other hand, one who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator. Similarly, a person does not become a conspirator merely by

associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists.

*See* Ninth Circuit Model Criminal Jury Instructions 9.19/46 U.S.C. § 70503(a).

## 2.      Vessel Subject to the Jurisdiction of the United States

To satisfy statutory jurisdiction under the MDLEA, the United States must prove that the vessel at issue is "subject to the jurisdiction of the United States." 46 U.S.C. § 70502(c)(1); *see also United States v. Perlaza*, 439 F.3d 1149, 1160 (9th Cir. 2006). While there are several ways jurisdiction may be established, under the facts of this case, the GFV in this case is "subject to jurisdiction of the United States" because it is "a vessel without nationality."[2] 46 U.S.C. § 70502(c)(1)(A).

A "vessel without nationality" is a vessel in which the master or individual in charge (1) makes a claim of registry that is denied by the nation whose registry is claimed; (2) fails, on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel: or (3) makes a claim for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality. 46 U.S.C. § 70502(d)(1).

A "claim of nationality or registry" is made through one of the following:

(1)     possession on board the vessel and production of documents evidencing the vessel's nationality;
(2)     flying its nation's ensign or flag; or
(3)     a verbal claim of nationality or registry by the master or individual in charge of the vessel.

46 U.S.C. § 70502(e). If no claim of nationality or registry is made, the vessel is a "vessel without nationality" or a "stateless vessel."

---

[2] Under 46 U.S.C. § 70502(c)(1), a vessel is also "subject to the jurisdiction of the United States" if it is (a) assimilated to a vessel without nationality; (b) registered in a foreign nation if that nation has consented or waived objection to enforcement; (c) in the customs waters of the United States; (d) in the territorial waters of a foreign nation if the nation consents to enforcement; and (e) in the contiguous zone of the United States.

While statutory jurisdiction is not an element of the offense, contested facts underlying the inquiry into the existence of statutory jurisdiction are factual questions that must be submitted to a jury. *Perlaza*, 439 F.3d at 1165-67. The United States has the burden to prove statelessness. *Id*. at 1167 n.20.

In this case, for both the May 23, 2017 and January 27, 2018 seizures, the United states intends to establish jurisdiction through 46 U.S.C. § 70502(c)(1)(A) (a "vessel without nationality"). Further, the United States will demonstrate that in each instance, the master made an oral claim of registry of Ecuadorian nationality. And in both instances, following a forms exchange, Ecuador responded that it could neither confirm nor deny the nationality of the vessel. Thus, there is jurisdiction under 46 U.S.C. § 70502(d)(1)(C) ("a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively or unequivocally assert that the vessel is of its nationality").

The United States will ask the jury to return a special verdict form with the following findings:

(1) The vessel was subject to the jurisdiction of the United States.

(2) The vessel was on the high seas.

46 U.S.C. §§ 70502(c)(1)(A), 70502(d)(1)(C).

### 3. Knowledge

To be guilty of conspiracy, the defendant must know that he is connected to the conspiracy. *United States v. Federico*, 658 F.2d 1337, 1344 (9th Cir. 1981), *overruled on other grounds*, *United States v. De Bright*, 730 F.2d 1255, 1259 (9th Cir. 1984) (en banc); *United States v. Smith*, 609 F.2d 1294, 1299 (9th Cir. 1979).

### 4. Participation in the Conspiracy

#### a. Between at least two persons

The government must show that a conspiracy between at least two people existed and that the defendant was a member of the conspiracy charged. *United States v. Reese*, 775 F.2d 1066, 1071 (9th Cir. 1985) (conspiracy must involve at least two people); *United*

11

*States v. Murray*, 751 F.2d 1528, 1534 (9th Cir. 1985) (charged defendant must be member of conspiracy).

### b.    Need not prove all members actually participated

The government need not prove that all the persons alleged to have been members of the conspiracy actually participated in the conspiracy. *United States v. Reese*, 775 F.2d 1066, 1071 (9th Cir. 1985).

### c.    Once conspiracy is proven, evidence connecting defendant to conspiracy is enough to show knowing participation

Once a conspiracy is proven, evidence establishing beyond a reasonable doubt the defendant's connection to that conspiracy—even if the connection is slight—is sufficient to convict him of knowingly participating in the conspiracy. *United States v. Stauffer*, 922 F.2d 508, 514-515 (9th Cir. 1990); *United States v. Guzman*, 849 F.2d 447, 448 (9th Cir. 1988).

### d.    Each defendant need not participate in all facets of conspiracy

Each defendant need not participate in all of the overt acts in a conspiracy. A single conspiracy may exist even though each defendant plays a different role in it. *United States v. Burreson*, 643 F.2d 1344, 1348 (9th Cir. 1981); *United States v. Camacho*, 528 F.2d 464, 470 (9th Cir. 1976).

### e.    Co-Conspirators need not know identities or roles of each other

Each conspirator need not know the identities or exact roles of all his co-conspirators. The government must show that each defendant knew, or had reason to know, the scope of the criminal enterprise and that each defendant knew, or had reason to know, that the benefits to be derived from the operation were probably dependent upon the success of the entire venture. *United States v. Abushi*, 682 F.2d 1289, 1293 (9th Cir. 1982); *United States v. Perry*, 550 F.2d 524, 528-29 (9th Cir. 1977). Every member of a conspiracy does not need to know every other member or be aware of all acts committed in furtherance of the conspiracy. *United States v. Taren-Palma*, 997 F.2d 525, 530 (9th Cir. 1993).

### f.  Defendant is vicariously liable for acts of co-conspirators

Every member of a conspiracy need not know every other member nor be aware of all acts committed in furtherance of the conspiracy. *United States v. Taren-Palma*, 997 F.2d 525, 530 (9th Cir. 1993); *see also Pinkerton v. United States*, 328 U.S. 640, 646-648 (1946) (conspiracy liability typically holds co-conspirators liable for all reasonably foreseeable acts taken to further the conspiracy).

### g.  Conspirators joining pre-existing conspiracy are liable for prior acts

A conspirator who joins a pre-existing conspiracy is bound by all that has gone on before in the conspiracy. *United States v. Saavedra*, 684 F.2d 1293, 1301 (9th Cir. 1982); *United States v. Traylor*, 656 F.2d 1326, 1337 (9th Cir. 1981); *United States v. Aponte-Suarez*, 905 F.2d 483, 490 (1st Cir. 1990).

### h.  Defendant can be guilty of conspiracy even if he does not realize benefits directly

A defendant can be guilty of conspiracy even if he does not realize benefits directly from underlying substantive offenses, but instead conspires to directly benefit others and only indirectly benefit himself. *United States v. Carruth*, 699 F.2d 1017, 1021 (9th Cir. 1983).

### 5.  Proof of the Conspiracy

### a.  No direct contact or explicit agreement required between all alleged conspirators

The government need not show direct contact or explicit agreement among all of the alleged conspirators. *United States v. Thomas*, 887 F.2d 1341, 1347 (9th Cir. 1989); *United States v. Reese*, 775 F.2d 1066, 1071 (9th Cir. 1985).

### b.  May be proven by circumstantial evidence that defendant with others in furtherance of common goal

The government may prove a conspiracy by circumstantial evidence that the defendant acted with others in furtherance of a common goal. *United States v. Kiriki*, 756

F.2d 1449, 1453 (9th Cir. 1985); *United States v. Murray*, 751 F.2d 1528, 1534 (9th Cir. 1985); *United States v. Bibbero*, 749 F.2d 581, 587 (9th Cir. 1984); *United States v. Thomas*, 887 F.2d 1341, 1347 (9th Cir. 1989).

### c. Mere presence, without more, is insufficient, but presence is probative of connection with the conspiracy

While mere presence at the scene of illegal activity is, without more, insufficient to infer that the defendant is part of the conspiracy, a defendant's presence may nevertheless be probative of that connection when viewed in the context of other evidence. *United States v. Thomas*, 887 F.2d 1341, 1347-48 (9th Cir. 1989).

### 6. Co-Conspirator Statements

Declarations by one co-conspirator during the course of and in furtherance of the conspiracy may be used against another conspirator because such declarations are not hearsay. Fed. R. Evid. 801(d) (2) (E).

### a. Admission of co-conspirator statements

Rule 801(d) (2) (E) requires a foundation that: (1) the declaration was made during the life of the conspiracy; (2) it was made in furtherance of the conspiracy; and (3) there is, including the co-conspirator's declaration itself, sufficient proof of the existence of the conspiracy and of the defendant's connection to it. *Bourjaily v. United States*, 483 U.S. 171, 173, 181 (1987).

### b. Preponderance of the evidence is required.

The government must prove by a preponderance of the evidence that a statement is a co-conspirator declaration in order for the statement to be admissible under Rule 801(d)(2)(E). *Bourjaily*, 483 U.S. at 176; *United States v. Crespo de Llano*, 838 F.2d 1006, 1017 (9th Cir. 1987).

### c. Trial court has discretion to introduce co-conspirator statements before establishing of conspiracy and defendant's connection to it.

The trial court has discretion to determine whether the Government may introduce co-conspirator declarations before establishing the conspiracy and the defendant's

14

connection to it. *United States v. Loya*, 807 F.2d 1483, 1490 (9th Cir. 1987); *United States v. Fleishman*, 684 F.2d 1329, 1338 (9th Cir. 1982).

Moreover, the court may allow the government to introduce co-conspirator declarations before laying the required foundation under the condition that the declarations will be stricken if the government fails to ultimately establish by independent evidence that the defendant was connected to the conspiracy. *United States v. Spawr Optical Research Inc.*, 685 F.2d 1076, 1083 (9th Cir. 1982).

**d.      Once a conspiracy is shown, only slight connections are required to lay foundation for co-conspirator statements.**

Once a conspiracy is shown, the government need present only slight evidence connecting a defendant to the conspiracy in order to lay the foundation for admission of a co-conspirator declaration. *Crespo de Llano*, 838 F.2d at 1017.

**e.      Statements of an unindicted co-conspirator in furtherance of the conspiracy may be used against charged conspirators.**

Declarations of an unindicted co-conspirator made in furtherance of the conspiracy may be used against a charged conspirator. *United States v. Nixon*, 418 U.S. 683, 701 (1974); *United States v. Williams*, 989 F.2d 1061, 1067 (9th Cir. 1993).

**f.      Defendant's presence at time of statement is not required.**

A defendant need not be present at the time the unindicted co-conspirator made the declaration. *Sendejas v. United States*, 428 F.2d 1040, 1045 (9th Cir. 1970).

**g.      Statements of unindicted co-conspirators may be introduced.**

A co-conspirator declaration is admissible if it was made in furtherance of a conspiracy even if the indictment does not allege a conspiracy against the co-conspirator. "The question is merely whether there was proof of a sufficient concert of action to show the individuals involved to have been engaged in a joint venture." *United States v. Manning*, 56 F.3d 1188, 1997 (9th Cir. 1995); *United States v. Layton*, 855 F.2d 1388, 1398 (9th Cir. 1988).

**h.** **Statement must further the common objectives of the conspiracy or set in motion transactions that are integral to it.**

To be admissible under Fed. R. Evid. 801(d)(2)(E) as a statement made by a co-conspirator in furtherance of the conspiracy, a statement must "further the common objectives of the conspiracy," or "set in motion transactions that [are] an integral part of the [conspiracy]." *United States v. Arambula-Ruiz*, 987 F.2d 599, 607-08 (9th Cir. 1993); *United States v. Yarbrough*, 852 F.2d 1522, 1535 (9th Cir. 1988).

**i.** **Statements intending to benefit the conspiracy are admissible regardless of actual benefit to the conspiracy.**

Statements made with the intent of furthering the conspiracy are admissible whether or not they actually result in any benefit to the conspiracy. *Williams*, 989 F.2d at 1068; *United States v. Schmit*, 881 F.2d 608, 612 (9th Cir. 1989); *United States v. Zavala-Serra*, 853 F.2d 1512, 1516 (9th Cir. 1988).

**j.** **Statements made to non-members are admissible.**

Co-conspirator declarations need not be made to a member of the conspiracy to be admissible under Rule 810(d)(2)(E). *Zavala-Serra*, 853 F.2d at 1516.

**k.** **Statements need not be exclusively or primarily in furtherance of the conspiracy to be admissible.**

A co-conspirator declaration need not have been made exclusively, or even primarily, to further the conspiracy. *Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir. 1989). A statement can be a co-conspirator declaration even if it is subject to alternative interpretations. *Id.*

**l.** **"In furtherance" requirement is construed broadly.**

Courts have interpreted the "in furtherance of" requirement broadly and have considered, among others, the following co-conspirator declarations as being made "in furtherance of the conspiracy":

(1) statements made to induce enlistment in the conspiracy, *United States v. Arias-Villanueva*, 998 F.2d 1491, 1502 (9th Cir. 1993)*, overruled on other grounds*

16

by *United States v. Jimenez-Ortega*, 472 F.3d 1102, 1103-04 (9th Cir. 2007); *United States v. Yarbrough*, 852 F.2d 1522, 1535 (9th Cir.);

(2)    statements made to keep a conspirator abreast of a co-conspirator's activity, or to induce continued participation in a conspiracy, or to allay the fears of a co-conspirator. *See id.*

(3)    statements made to prompt action in furtherance of the conspiracy by either of the participants to the conversation, *United States v. Layton*, 720 F.2d 548, 556 (9th Cir. 1983);

(4)    statements by a co-conspirator designed to elicit payment for narcotics, *United States v. Mason*, 658 F.2d 1263, 1270 (9th Cir. 1981);

(5)    statements by a co-conspirator designed to facilitate planned further narcotics deliveries, *see id.*;

(6)    statements made to explain the delay in carrying out the drug transaction, *United States v. Lechuga*, 888 F.2d 1472, 1480 (5th Cir. 1989);

(7)    "puffing," boasts and other conversation designed to obtain the confidence of another conspirator (or putative co-conspirators), *United States v. Santiago*, 837 F.2d 1545, 1549 (11th Cir. 1988); *United States v. Miller*, 664 F.2d 94, 98 (5th Cir. 1981).

**B.    Count 2 – Conspiracy to Distribute Cocaine Intended for Unlawful Importation 21 U.S.C. §§ 959, 960, 963.**

**1.    Essential Elements**

To prove conspiracy to distribute cocaine intended for unlawful importation in violation of 21 U.S.C. §§ 959, 960, 963, the United States must prove each of the following elements:

1.    Beginning on date unknown and ending on or about January 2018, there was an agreement between two or more persons to distribute cocaine or some other federally controlled substance outside of the United States;

2.    Defendant joined in the agreement knowing of its purpose and intending to help accomplish that purpose;

3. Defendant knew, intended, or had reasonable cause to believe that the cocaine or some other federally controlled substance was to be unlawfully brought into the United States;

In addition, the United States must prove beyond a reasonable doubt that the offense involved at least 5 kilograms of cocaine.

"Reasonable cause to believe" means having knowledge of facts which, although not amounting to direct knowledge, would cause a reasonable person knowing the same facts to conclude that the cocaine was to be unlawfully brought into the United States.

To "distribute" means to deliver or transfer possession of cocaine to another person, with or without any financial interest in that transaction.

It does not matter whether the defendant knew that the substance was cocaine. It is sufficient that the defendant knew that it was some kind of a federally controlled substance.

To "possess with intent to distribute" means to possess with intent to deliver or transfer possession of cocaine or some other federally controlled substance to another person, with or without any financial interest in the transaction.

Manual of Model Jury Instructions for the Ninth Circuit § 9.15 (2010); 46 U.S.C. § 70503.

In addition, the United States must prove beyond a reasonable doubt that the offense involved at least 5 kilograms of cocaine.

**2. Knowledge, Intent or Reasonable Cause to Believe the Cocaine Would be Unlawfully Imported into the United States**

The following are types of evidence held sufficient to establish that a defendant knew, intended, or had reasonable cause to believe the drugs he was distributing in a foreign country were intended for unlawful importation into the United States as required under the third element of a 21 U.S.C. § 959 charge.

(1)     involvement of large amounts of U.S. currency in transactions, *United States v. Borda,* 848 F.3d 1044, 1054 (D.C. Cir. 2017) (defendants kept ledgers showing receipt of U.S. currency in § 959 conspiracy); *United States v. Rojas,* 812 F.3d 382, 400 (5th Cir. 2016); *United States v. Romero–Padilla*, 583 F.3d 126, 129–30 (2d

18

Cir. 2009);

(2)     modes of transportation showing the destination was ultimately the United States, *Rojas,* 812 F.3d at 400;

(3)     use of common, known smuggling routes that head to the United States, *Borda*, 848 F.3d at 1054; *Rojas*, 812 F.3d at 400; *United States v. Mejia*, 448 F.3d 436, 451 (D.C. Cir. 2006) (citing expert testimony that cocaine was seized on a principal land route for cocaine from Panama to the United States);

(4)     testimony that the majority of cocaine transported into Mexico is subsequently transported into the United States, *Rojas*, 812 F.3d at 400-01; *United States v. Martinez*, 476 F.3d 961, 969 (D.C. Cir. 2007) (Kavanaugh, J.) (citing as evidence in support of jury verdict a DEA agent's testimony that almost every drug operation that transports Colombian cocaine through Central America intends to import the cocaine into the United States);

(5)     testimony regarding drug value and economic incentives to import cocaine into the U.S. instead of selling it in Mexico or South or Central America, Rojas, 812 F.3d at 401; *Martinez*, 476 F.3d at 969 (rejecting an insufficiency argument in part because there was evidence that the sales price of cocaine increased dramatically if the drug was sold in the United States);

(6)     testimony of co-conspirators that they knew the cocaine involved in the conspiracy was being routed through Mexico to the United States, *Rojas*, F.3d at 401; *Martinez*, 476 F.3d at 969 (citing co-conspirators' knowledge that cocaine was headed to the United States as evidence that the defendant knew of the destination); *Borda*, 848 F.3d at 1054 (co-conspirator's testimony combined with other circumstantial evidence was sufficient);  and

(7)     concerns about the presence of investigation of U.S. law enforcement into their operations, *United States v. Alexander*, 958 F.3d 1, 9 (1st Cir. 2020) (finding sufficient evidence that conspirators knew the cocaine was destined to the United States where a defendant was fearful of U.S. law enforcement).

19

"Reasonable cause to believe" means having "knowledge of facts which, although not amounting to direct knowledge, would cause a reasonable person knowing the same facts to conclude" that the cocaine would be unlawfully brought into the United States. *United States v. Kaur*, 382 F.3d 1155 (9th Cir. 2004) (approving instruction stating defendant "had reasonable cause to believe if [he] actually knew facts that would alert a reasonable person" that a precursor chemical would be used to make methamphetamine); knew facts that would alert a reasonable person; *United States v. Prather*, 205 F.3d 1265, 1271 (11th Cir. 2000) (affirming district court's instruction stating "[T]he government must show that based on the facts known to the defendant—although not showing actual knowledge of the defendant—based on these facts would case a reasonable person knowing those facts to reasonably conclude…").

**C.    Admissibility of the Wiretap Intercepts**

The United States will lay the foundation for admission of the Blackberry wiretap intercepts through (1) a case agent who will describe how the HSI wire room works; (2) a representative from Blackberry who will testify regarding the receipt of the wiretap orders in question in this case and the provisioning of lines; and (3) the primary case agent (and wiretap affiant) regarding the dates of the wiretap orders and the dates of wiretap intercepts.

In addition, in several instances, the government can further authenticate certain wiretap intercepts through testimony of the actual individuals intercepted on the wiretap.

**D.    Chain of Custody**

The United States may establish chain of custody to lay a proper foundation for admission of physical evidence if it is able to prove that a reasonable juror could find that the evidence is in substantially the same condition as when it was seized and if there is a reasonable probability the evidence has not been changed in important respects. *United States v. Harrington*, 923 F.2d 1371, 1374 (9th Cir. 1991). "The government need only make a prima facie showing of authenticity, as 'the rule requires only that the court admit evidence if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification.'" *United States v. Black*, 767 F.2d 1334, 1342 (9th

Cir. 1985) (quoting 5 J. Weinstein & M. Berger, Weinstein's Evidence Par. 901(a)[01], at 901 16 to 17 (1983)).  Merely raising the possibility of tampering, however, is not enough to render evidence inadmissible. *Id.*  Furthermore, a defect in the chain of custody goes to the weight, not the admissibility, of the evidence introduced.  *See United States v. Matta-Ballesteros*, 71 F.3d 754, 768-69 (9th Cir. 1995), *amended by*, 98 F.3d 1100 (9th Cir. 1996).

**E.    Certified Business Records**

The government will introduce certified business records from Avianca Airlines at trial.  Under Fed. R. Evid. 901(11), business records accompanied by a custodian of records certification are admissible.  The Court ruled on the admissibility of these documents at the motion *in limine* hearing.

**F.    Foreign Public Records**

The government will introduce foreign public records that are signed and certified by the Government of Guatemala.  These records are self-authenticating.  Under Fed. R. Evid. 902(3), a document that purports to be signed or attested by a person who is authorized by a foreign country's law to do so is admissible as self-authenticating evidence. The document must be accompanied by a final certification that certifies the genuineness of the signature and official position of the signer or attester — or of any foreign official whose certificate of genuineness relates to the signature or attestation or is in a chain of certificates of genuineness relating to the signature or attestation.  The government moved *in limine* to admit these documents, which consist of Guatemalan identity and passport records for the defendant.  The Court ruled these documents were admissible.

**G.    Duplicates**

A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original, or (2) under circumstances, it would be unfair to admit the duplicate instead of the original. *See* Fed. R. Evid. 1003.

//

//

21

## IV. WITNESSES

The United States expects to call the following witnesses in its case-in-chief, although it reserves the right to change the order of these witnesses, substitute witnesses, or add or omit one or more witnesses:

- HSI Special Agent Bethany Watrous
- HSI Special Agent Seth Flanagan
- USCG LT Anthony Orr
- USCG MEC Ryan Lewis
- USCG ME1 John Alvarez
- USCG BM2 Jorge Rivera
- Shaun Hodgins, formerly USCG
- Willian Estuardo Lemus-Lara, aka "Humilde"
- Luis Carlos Melgar-Morales, aka "Aquaman"
- Rafael Orlando Ramirez-Barillas, aka "Thor"
- DEA Forensic Chemist Sariah Bahner (formerly Cantrell)
- DEA Forensic Chemist Thaddeus Mostowtt (pronounced Moss–Stout)
- DEA Special Agent Ronald Sandoval
- HSI Special Agent Scott Templin
- Andrew Turi, Blackberry Ltd.

The parties are finalizing a stipulation regarding Spanish translations. In the unlikely event that does not materialize, these witnesses would be needed at trial:

- Spanish Language Interpreter Carlotta Hernandez (absent stipulation)
- Spanish Language Interpreter Andreea Boscor (absent stipulation)

## V. EXHIBIT LIST

The following is a partial list of the exhibits the United States intends to offer in its case-in-chief. The United States reserves the right to add or remove exhibits from this list, and will provide a complete list and set of final trial exhibits to the defense prior to trial. The exhibits in this case may include:

1. Demonstrative drug value charts;

2.  Maps showing various interests relevant to the investigation, including the location of U.S. Coast Guard interdictions, and areas discussed over the wiretap interceptions;

3.  Summary chart of wiretap interception orders, dates, and Blackberry PINs;

4.  Records establishing the foundation for Blackberry wiretap intercepts;

5.  Translated message strings consisting of intercepted electronic communications over Blackberry Messenger;

6.  Certified flight records from Avianca Airlines;

7.  Certified and translated Guatemalan public records for Josue Lemus-Lara's and Myve Lorena Orellana-Morales's Guatemalan national identity and passport information;

8.  Photographs of co-conspirators, including the defendant, Willian Lemus-Lara, Luis Carlos Melgar-Morales, Rafael Orlando Ramirez-Barillas, and Myve Lorena Orellana-Morales;

9.  Translated Excel spreadsheets consisting of ledgers of maritime smuggling events;

10. Seized drugs and photos of bulk cocaine seized in this case;

11. Photographs of documents and electronic devices seized during the U.S. Coast Guard seizures on May 23, 2017 and January 27, 2018;

12. Photographs of vessels and crewmembers onboard vessels interdicted on May 23, 2017 and January 27, 2018;

13. Records associated with the chain of custody of the seized drugs;

14. Documents pertaining to the right of visit/law enforcement boarding, commonly referred to as "Forms Exchange" documents;

15. Documents related to the identification of Josue Adan Lemus-Lara and other co-conspirators;

16. Screenshots of a Blackberry conversation seized on January 26, 2018 containing images of the crew members onboard the vessel from the January 27, 2018 Coast Guard seizure.

17. Demonstrative image of a Blackberry phone.

23

## VI. PROPOSED VOIR DIRE

1.    The Court will instruct you about the law.  Will you follow the law as given by the Court and disregard any idea you have about what the law is or should be?

2.    The United States will be calling witnesses employed by the United States Coast Guard, Homeland Security Investigations, and the Drug Enforcement Administration. Does anyone have family members or close friends who work, or have worked, for these agencies?  Would that prevent you from being fair and impartial?  Does anyone have any negative views of these agencies that would prevent you from being fair and impartial?

3.    Has anyone had an unpleasant or negative experience with any law enforcement personnel?  Would that cause you to be biased against law enforcement?

4.    Has anyone ever had any disputes with any agency of the United States Government?  If so, please describe.

5.    Have you or any relatives or close friends ever been accused of, or charged with a drug related crime?

6.    Has anyone had any training in the law?  If so, please explain.

7.    Will you be able to put aside any feeling of sympathy or pity for the defendant when deciding the facts of this case?

8.    Does everybody understand that a defendant is entitled to a fair trial?  Does everybody understand that the United States is also entitled to a fair trial?

9.    Does anybody have any moral or religious reservations that might prevent him/her from standing in judgment of other human beings?

10.    The defendants in this case are charged with offenses related to cocaine smuggling. Does anybody have strong feelings or opinions about U.S. drug laws that would prevent him/her from viewing the evidence impartially?

11.    The law requires the United States to prove its case against the defendants beyond a reasonable doubt.  If you are selected, would you want the United States to prove its case by a higher standard of proof, *e.g.*, beyond any possible doubt?

12.    Is anyone here involved in criminal defense work?  Does anyone have any friends or family members who are involved in criminal defense work?  Is anyone here involved

in law enforcement?  Does anyone have any friends or family members who are involved in law enforcement?

13.     Regardless of any position you may have on the legalization or criminalization of any type of narcotics, if you become a juror in this federal trial, will you be able to follow the federal law of the United States as it presently stands and as the judge instructs you regarding crimes at issue in this case?

## VII.   JURY INSTRUCTIONS

The United States requests that the standard Ninth Circuit model instructions be given in this case as modified to fit offenses under 46 U.S.C. §§ 70503 and 70506 and 21 U.S.C. §§ 959, 960, 963.  The United States will submit a set of proposed jury instructions in keeping with the Court's preferences prior to trial.

DATED: October 24, 2023                    Respectfully submitted,

TARA K. MCGRATH
United States Attorney

/s/P. Kevin Mokhtari
P. KEVIN MOKHTARI
Assistant U.S. Attorney
ALLISON B. MURRAY
Special Assistant U.S. Attorney